# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Department of Justice<br>Antitrust Division<br>450 5th Street NW, Suite 8700<br>Washington, DC 20530 | |
| | CASE NO.: |
| Plaintiff | |
| v. | DECK TYPE: Antitrust |
| CAMERON INTERNATIONAL CORPORATION<br>1333 West Loop South, Suite 1700<br>Houston, TX 77027 | DATE STAMP: |
| and | JUDGE: |
| NATCO GROUP INC.<br>11210 Equity Drive, Suite 100<br>Houston, TX 77041 | |
| Defendants | |

## COMPLAINT

The United States of America ("United States"), acting under the direction of the

Attorney General of the United States, brings this civil antitrust action against defendants

Cameron International Corporation ("Cameron") and NATCO Group Inc. ("NATCO") to enjoin

Cameron's proposed acquisition of NATCO, to remedy the harm to competition caused by

Cameron's acquisition of certain assets from Chicago Bridge & Iron N.V. ("CB&I"), and to

obtain other equitable relief. United States complains and alleges as follows:

1

I.    **NATURE OF THE ACTION**

1.    On June 1, 2009, Cameron and NATCO entered into an Agreement and Plan of Merger pursuant to which Cameron agreed to acquire NATCO in an all-stock transaction. On November 18, 2009, NATCO intends to hold a meeting for shareholders to vote on whether to approve the transaction.

2.    Cameron is a worldwide provider of products, systems, and services used at or near oil or gas wells (upstream) and in refineries (downstream); of valves, auxiliary equipment, and flow measurement systems used in oil and gas drilling, production, transportation, and refining markets; and of compression products, systems, and services to the oil, gas, and process industries. Cameron is the leading U.S. supplier of customized electrostatic desalters used in the oil refining industry (hereafter, "refinery desalters").

3.    NATCO is a worldwide provider of equipment, systems, and services used to separate oil, gas, and water within a production stream and to remove contaminants. It also sells equipment used in downstream refinery and petrochemical facilities around the world to improve processing and separation. After Cameron, NATCO is the next most significant U.S. supplier of refinery desalters.

4.    In the United States, Cameron's proposed acquisition of NATCO would reduce from three to two the number of companies that bid on refinery desalter projects and would give Cameron virtual monopoly power in the U.S. refinery desalter market. Unless the proposed acquisition is enjoined, competition for the supply of refinery desalters will be substantially reduced in the United States. The proposed acquisition likely would result in higher prices, less favorable terms of sale, and less innovation in the U.S. refinery desalter market.

2

5.    On October 7, 2005, Cameron, through Petreco International, Inc., and CB&I, through Howe Baker Engineers Ltd. ("Howe Baker"), entered into an agreement for the sale of assets of the desalting, dehydration, distillate treating, and gas oil separation equipment business of Howe Baker (hereafter, the "Howe Baker assets") for $8.25 million.  Cameron acquired the Howe Baker assets in late 2005.

6.    In the United States, Cameron's acquisition of the Howe Baker assets reduced from two to one the number of sellers of refinery desalters in the United States and created a monopoly in the U.S. refinery desalter market.  After Cameron acquired the Howe Baker assets, NATCO entered the market for refinery desalters.

7.    The United States brings this action to prevent the proposed acquisition of NATCO by Cameron because that acquisition would substantially lessen competition in the development, production, and sale of refinery desalters in the United States in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18 and to remedy the loss of competition caused by Cameron's acquisition of the Howe Baker assets because that acquisition substantially lessened competition in the development, production, and sale of refinery desalters in the United States also in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

## II.    THE PARTIES

8.    Cameron is incorporated in Delaware and has its principal place of business in Houston, Texas.  In 2008, Cameron reported total sales of approximately $5.85 billion, and its sales of refinery desalters in the United States were approximately $10.2 million in 2008.

3

9.     NATCO also is incorporated in Delaware and has its principal place of business in Houston, Texas.  NATCO reported 2008 revenues of $657 million, and its sales of refinery desalters in the United States were approximately $10.55 million.

## III.    JURISDICTION AND VENUE

10.     The United States brings this action under Section 15 of the Clayton Act, 15 U.S.C. §§ 4 and 25, as amended, to prevent and restrain defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18.

11.     Defendants develop, produce, and sell refinery desalters and other products in the flow of interstate commerce.  Defendants' activities in the development, production, and sale of these products substantially affect interstate commerce.  This Court has subject matter jurisdiction over this action pursuant to Section 15 of the Clayton Act, 15 U.S.C. § 25, and 28 U.S.C. §§ 1331, 1337(a), and 1345.

12.     Defendants have consented to venue and personal jurisdiction in this judicial district.

## IV.    TRADE AND COMMERCE

### A.     The Relevant Product Market

13.     When oil is produced "upstream" at a production well head, it may be mixed with water, dissolved salt, and other impurities including solids.  Upstream, a variety of separation equipment is used to remove such impurities from the oil, and electrostatic separation equipment sometimes is required to meet transportation specifications.  If electrostatic separation equipment is required upstream, water typically is specified to be removed to a volume of about one percent.

4

Outside of the United States, producers sometimes also must use electrostatic equipment upstream to remove salt to levels of approximately two to ten pounds per thousand barrels prior to transport, but more often salt is not removed upstream.

14.    In the United States, refinery desalters are used to remove salt from crude oil "downstream" at the oil refining stage of production.  Prior to introduction of the crude into the refinery desalter, fresh water is mixed into the incoming crude at a volume of about three to ten percent in order to dissolve the salt.  Separation of the resulting salt-water mixture from the oil results in removal of salt to levels of no more than two pounds of salt per thousand barrels, and often significantly less, and of water to levels of approximately 0.2 to 0.5 percent by volume. Desalting is a critical initial stage of the refining process.

15.    Compared to upstream electrostatic separation equipment, refinery desalters remove water and salt to lower specified levels and must produce cleaner effluent water. Refinery desalters handle higher oil volumes than upstream electrostatic separation equipment because refinery capacity typically is much greater than output at a single production wellhead. Unlike most upstream electrostatic separation equipment, refinery desalters often must remove solids; must handle oil that has been pre-heated to approximately 230 to 300 degrees, which changes the electrical properties of oil; must handle water droplets of a much smaller size and tighter emulsions of oil and water; and must be able to perform effectively with blends of incoming crudes and changing feedstocks.  Both upstream electrostatic separation equipment and refinery desalters are used in conjunction with chemicals that enhance their performance, but optimizing chemical usage for refinery desalters is much more difficult than optimizing chemical usage upstream.

5

16.     Refinery desalters consist of a steel pressure vessel with an external transformer and controller as well as a set of "internals" that include electrodes. Inside the desalter pressure vessel, high-voltage electrical charges cause water droplets containing dissolved salt to coalesce into larger and larger droplets. As water droplets reach a critical size, they sink to the bottom of the vessel because water is more dense than oil. Oil is removed from the top of the vessel for further processing in the refinery; waste water is removed from the vessel bottom. Solids that sink to the bottom of the vessel also are removed. When incoming oil has especially high salt content and/or is particularly dense, refineries may have to use two successive refinery desalter units (or, in rare cases, three units) to meet their salt removal requirements.

17.     Refineries vary widely in processing capacity. In addition, the characteristics of feedstock oil purchased by refineries vary across refineries and within refineries over time in terms of density, the blends of crudes mixed together, electrical properties, salt content, and the amount of other impurities. Refineries also differ in the levels of salt and entrained water that they specify may remain in the oil. As a result, refinery desalters are custom-designed to be able to remove salt and water from different crude feedstocks to different customer-specified levels, and to handle different customer-specified volumes. Further, some customers demanding refinery desalters require only new internals to replace worn-out internals, to accommodate a capacity expansion, or to handle a new type of crude feedstock, whereas other customers require a complete system including the pressure vessel and internals.

18.     Chemicals frequently are added to enhance the separation of oil from the water containing salt in refinery desalters. However, chemicals alone cannot remove salt to desired levels, and the cost of adding chemicals to achieve a given level of salt removal is significantly

higher than the cost of purchasing and operating a refinery desalter to achieve a similar level of salt removal.

19.    Refinery desalters are sold pursuant to bids, which are based on technical specifications from the customer and include commercial terms.  Suppliers of refinery desalters use patented and/or proprietary technology and know-how—including expertise gained through years or decades of trial and error and experience with prior installations—to custom-design refinery desalters that satisfy technical specifications.

20.    Refineries (and the firms that they consult) evaluate competing bids based on their compliance with technical specifications and commercial considerations such as price, delivery schedule, and terms of sale.  The combined technical and commercial needs of the customer differ for each refinery desalter project.

21.    A small but significant post-acquisition increase in refinery desalter prices would not cause customers to substitute upstream electrostatic equipment (or any other type of equipment) or to utilize a chemicals-only solution with sufficient frequency so as to make such price increases unprofitable.  Accordingly, refinery desalters are a line of commerce and relevant product market within the meaning of Section 7 of the Clayton Act.

**B.    The Relevant Geographic Market**

22.    Those competitors that could constrain Cameron from raising prices on bids for refinery desalters in the United States typically are suppliers with a substantial physical United States presence, including sales, technical, and support personnel and parts distribution.

23.    Refineries prefer such suppliers because, during the design, bid, execution, and installation phases of a desalter project, customers interact with suppliers to address design recommendations and changes, track construction progress, and ensure successful installation. Further, customers purchasing refinery desalters can avoid costly delays or downtime in refinery operations by selecting a desalter supplier that is able to respond to requests for service or replacement parts during the operating life of the desalter.

24.    A small but significant increase in the price of refinery desalters would not cause a sufficient number of customers in the United States to turn to manufacturers of refinery desalters that do not have a substantial physical presence in the United States so as to make such a price increase unprofitable. Accordingly, the United States is a relevant geographic market within the meaning of Section 7 of the Clayton Act.

### C.    Competitive Effects

(1)    The Proposed Acquisition of NATCO by Cameron

25.    The proposed acquisition of NATCO by Cameron would substantially lessen competition in the U.S. refinery desalter market. The competition between Cameron and NATCO in the development, production, and sale of refinery desalters has benefitted customers. Cameron and NATCO compete directly on price, terms of sale, and technology. For many oil refineries, NATCO is the preferred alternative to Cameron. The proposed acquisition would eliminate Cameron's most significant competitor in the sale of refinery desalters in the United States.

8

26.     Only three competitors, including Cameron and NATCO, have sold refinery desalters in the United States since 2007.  The third company often does not submit bids on U.S. refinery desalter projects and has sold just one refinery desalter in the United States, which occurred in 2008.

27.     Most desalter sales are competitive, with the customer seeking alternative bidders. When sales are competitive, each bidder may be aware of its competitors, but it does not know the technical or commercial terms of its competitors' bids prior to submitting its own bid.  That uncertainty restrains each bidder's pricing.

28.     Cameron's acquisition of NATCO would eliminate many customers' preferred alternative to Cameron and reduce from three to two—or for some bids, reduce from two to one—the number of bidders.  Post-acquisition, Cameron would gain the incentive and ability to profitably raise its bid prices significantly above pre-acquisition levels.

29.     The response of the remaining refinery desalter manufacturer would not be sufficient to constrain a unilateral exercise of market power by Cameron after the acquisition. Cameron would be aware that many customers strongly prefer it as a supplier, allowing it to raise prices above pre-acquisition levels.  The sole remaining bidder would have an incentive to increase its bid price in response.  Thus, the acquisition of NATCO by Cameron creates an incentive for Cameron and the remaining bidder to bid a higher amount than each otherwise would if NATCO were still a competitor.  Likewise, elimination of NATCO as a competitor would reduce the remaining bidders' incentives to offer quick delivery or other terms of sale

attractive to customers and to invest in certain technology improvements, such as NATCO's dual frequency technology.

30.    Therefore, the proposed acquisition would substantially lessen competition in the development, production, and sale of refinery desalters in the United States and lead to higher prices, less favorable terms of sale, and less innovation in the refinery desalter market, in violation of Section 7 of the Clayton Act.

(2)    The Acquisition of the Howe Baker Assets

31.    When Cameron acquired the Howe Baker assets in 2005, Cameron accounted for approximately 75 percent of refinery desalter sales in the United States, and CB&I accounted for approximately 25 percent of such sales, between 2003 and 2005. Through its purchase of the Howe Baker assets, Cameron willfully acquired a monopoly in refinery desalter sales.

32.    The acquisition of the Howe Baker assets by Cameron substantially lessened competition in the U.S. refinery desalter market. Competition between Cameron and CB&I in the development, production, and sale of refinery desalters benefitted customers. Cameron and CB&I competed directly on price, terms of sale, and technology. The acquisition eliminated Cameron's then only competitor in the sale of refinery desalters in the United States and gave Cameron the market power to raise prices, offer less favorable terms of sale, and invest less in technology.

33.    Through its purchase of the Howe Baker assets, Cameron substantially lessened competition and willfully acquired a monopoly in the development, production, and sale of refinery desalters in the United States, in violation of Section 7 of the Clayton Act.

10

V.    ENTRY

34.    Substantial, timely entry of additional competitors is unlikely and, therefore, will not prevent the harm to competition caused by elimination of NATCO as a bidder.

35.    A small number of companies have sold refinery desalters outside the United States, but these companies have no relevant, substantial U.S. presence.  Given the small size of the U.S. refinery desalter market, they are unlikely to invest in establishing the personnel and parts distribution presence required to compete effectively in the United States.  When NATCO entered the U.S. refinery desalter market in 2007, it had made numerous sales of refinery desalters outside the United States.  However, NATCO was uniquely motivated and well-situated to enter the market because of its status as a worldwide leader in electrostatic technology and because it already had a relevant, substantial U.S. presence in other products.

36.    Firms attempting to enter into the development, production, and sale of refinery desalters in the United States face a combination of barriers to entry.  The technology and expertise involved in developing and producing refinery desalters capable of handling U.S. crude feedstocks is a significant entry barrier.  To develop the technical expertise necessary to produce a reliable refinery desalter, it is not sufficient that a producer be successful in meeting customer specifications for separation equipment sold upstream at the production wellhead.  For many years, NATCO has been the leading supplier of electrostatic dehydrators sold upstream. Nonetheless, NATCO technical personnel have spent approximately three years improving their understanding of the nuances of refinery desalters to meet the needs of U.S. customers.

37.    The crude feedstock purchased by U.S. refineries has grown heavier and more difficult to process over time as lighter crude sources are being depleted. In recent years, several U.S. refinery customers have needed to upgrade existing refining desalters in order to process heavier feedstocks than the refinery desalters were initially designed to handle. Similar upgrades are likely to be a source of refinery desalter demand in the United States in the years ahead. As a result, NATCO has invested in research to develop and improve technologies specifically aimed at processing heavy crude oils. To compete effectively in the U.S. refinery desalter market, a supplier must offer a product capable of processing heavy crude oils, which contributes to the technical and expertise-related barrier to entry facing potential entrants.

38.    Establishing a reputation for successful performance and/or gaining customer confidence is a second significant barrier to entry. If a refinery desalter is not performing up to specification in terms of removing salt and water from oil, removing oil from produced water, or removing solids, refinery equipment can be damaged, a customer may run afoul of environmental waste water regulations, and refinery operations may even need to be shut down to carry out repairs. As a result of these costly consequences of poor refinery desalter performance, U.S. oil refineries are reluctant to purchase a refinery desalter from a supplier that does not have either a reputation and track record of successful performance on crude oil comparable to the crude oil the customer expects to treat or a significant new technology that the customer is satisfied will work on its expected crude.

39.    Establishing a reputation for successful performance and/or gaining customer confidence in a significant new technology can take years and the expenditure of substantial sunk costs. Since 2007, NATCO has had several employees and consultants partly or fully devoted to

developing relationships with U.S. refineries. It has also invested significant funds in developing and improving its latest electrostatic technology and making other improvements related to refinery desalters.

40.    Financial scale is an additional barrier to entry. Customers prefer suppliers able to stand financially behind a multi-million dollar order, and to respond quickly and effectively to a request for service or parts and to meet warrantee obligations years after the initial sale. A supplier of refinery desalters therefore must be able to prove that it is financially sound and has sales far in excess of the price of a refinery desalter.

41.    For these reasons, entry or expansion by any other firm into the U.S. refinery desalter market would not be timely, likely, and sufficient to defeat the substantial lessening of competition that would result if Cameron acquires NATCO.

## VI.    VIOLATIONS ALLEGED

### FIRST CAUSE OF ACTION
(Violation of Section 7 of the Clayton Act: Proposed Acquisition of NATCO)

42.    The United States incorporates the allegations of paragraphs 1 through 41 above.

43.    The proposed acquisition of NATCO by Cameron would substantially lessen competition and tend to create a monopoly in interstate trade and commerce in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

44.    Unless restrained, the transaction will have the following anticompetitive effects, among others:

    a.    actual and potential competition between Cameron and NATCO in the development, production, and sale of refinery desalters in the United States will be eliminated;

    b.    competition generally in the development, production, and sale of refinery desalters in the United States will be substantially lessened; and

    c.    prices for refinery desalters in the United States likely will increase, the terms of sale to customers in the United States likely will be less favorable, and innovation relating to refinery desalters in the United States likely will decline.

## SECOND CAUSE OF ACTION

(Violation of Section 7 of the Clayton Act: Acquisition of Howe Baker Assets)

45.    The United States incorporates the allegations of paragraphs 1 through 41 above.

46.    The acquisition of the Howe Baker assets by Cameron substantially lessened competition and created a monopoly in interstate trade and commerce, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

47.    The transaction had the following anticompetitive effects, among others:

    a.    actual and potential competition between Cameron and CB&I in the development, production, and sale of refinery desalters in the United States was eliminated; and

14

    b.      competition generally in the development, production, and sale of refinery desalters in the United States was substantially lessened, and Cameron acquired a monopoly.

## VII. REQUEST FOR RELIEF

48.    Plaintiff requests that this Court:

    a.      Adjudge and decree Cameron's proposed acquisition of NATCO to be unlawful and in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18;

    b.      Adjudge and decree Cameron's acquisition of the Howe Baker assets to be unlawful and in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18;

    c.      Preliminarily and permanently enjoin and restrain defendants and all persons acting on their behalf from consummating the proposed acquisition of NATCO by Cameron or from entering into or carrying out any contract, agreement, plan, or understanding, the effect of which would be to combine Cameron with the operations of NATCO;

    d.      Compel Cameron to divest the Howe Baker assets and to take any further actions necessary to restore the U.S. refinery desalter market to the competitive position that existed prior to the acquisition of the Howe Baker assets by Cameron;

    e.      Award the United States its costs for this action; and

      f.     award the United States such other and further relief as the Court deems

just and proper.

Respectfully submitted,

FOR PLAINTIFF UNITED STATES OF AMERICA:


_____
Christine A. Varney
Assistant Attorney General


_____
Maribeth Petrizzi
Chief, Litigation II Section
D.C. Bar #435204


_____
Molly S. Boast
Deputy Assistant Attorney General


_____
Dorothy B. Fountain
Assistant Chief, Litigation II Section
D.C. Bar #439469


_____
Patricia A. Brink
Deputy Director of Operations


_____
Christine A. Hill (DC Bar#461048)
James K. Foster
Warren A. Rosborough (DC Bar#495063)
Alexander G. Krulic (DC Bar#490070)
Attorneys
United States Department of Justice
Antitrust Division, Litigation II Section
450 Fifth Street NW, Suite 8700
Washington, D.C.  20530
(202) 305-2738


Dated: November 17, 2009


16